UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JALISSA P.,

                    Plaintiff,

        v.

FRANK J. BISIGNANO,[1]

                    Defendant.

Case No. 24-cv-06465-SI

**ORDER REMANDING ACTION FOR PAYMENT OF BENEFITS**

Re: Dkt. Nos. 13, 17

Pursuant to 42 U.S.C. § 405(g), plaintiff Jalissa P. filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security denying her disability benefits claim. Plaintiff moves for summary judgment. Dkt. No. 13 (Pl.'s Br.). Defendant cross-moves for summary judgment. Dkt. No. 17 (Def.'s Br.). Having considered the briefs and the administrative record, and for the reasons set forth below, the Court REVERSES the decision of the Commissioner and REMANDS this action for immediate payment of benefits pursuant to sentence four of 42 U.S.C. § 405(g).

**BACKGROUND**

**I.      Factual/Medical Background**

On August 9, 2018, plaintiff protectively filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Administrative Record ("AR") 37, 138. Plaintiff alleged an onset date of June 1, 2010, later amended to July 17, 2015. AR 37, 138. In her mid-20's at the time, she alleged disability on the basis of depression, post-traumatic stress disorder,

---

[1] In the case caption, the Court substitutes Frank J. Bisignano, the current Commissioner of Social Security, for his predecessor. *See* Fed. R. Civ. P. 25(d).

United States District Court
Northern District of California

a dislocated left knee, and nerve damage in two fingers on the right hand. AR 138. Plaintiff has a history of severe abuse, including sexual abuse by her brother, which led to her entering the foster care system around age 12, approximately the same time that her mental health symptoms began. While she was a teenager in foster care, plaintiff gave birth to a son, who was removed from her care as an infant. AR 1583-1584, 1673. Plaintiff has been hospitalized multiple times for suicidal behavior, including after an attempt to hang herself while living in a group home at age 15, for cutting her wrist at age 17, and after lying down in the middle of the street. *See* AR 159, 1583, 2234, 3483. In October 2015, plaintiff transitioned out of extended foster care services. AR 3367.

It is undisputed that plaintiff heavily used alcohol and drugs on a regular basis from about 2016 until she entered a residential treatment program (Women's Hope) in June 2021. Drug use included marijuana, cocaine, methamphetamine, and fentanyl. The record indicates, and the ALJ found, that plaintiff has been sober since entering residential drug treatment in June 2021, except that she uses marijuana every other day to curb her desire for other drugs. *See* AR 44-45, 94.

The record contains medical opinions and evaluations from numerous treating providers and from consultative examiners. While plaintiff was in extended foster care, she received wraparound services from Seneca Center. On March 31, 2015, Chloe Gendreau, A.S.W., completed an initial assessment report. ASW Gendreau found that plaintiff's symptoms "continue[d] to meet the criteria for Major Depressive Disorder, recurrent with moderate severity." AR 3354. ASW Gendreau noted that plaintiff had not been attending school regularly since November 2014, that "her lack of motivation and isolating behaviors" caused her to miss necessary appointments which then caused her to lose an employment opportunity and jeopardized her housing. AR 3352, 3354. Plaintiff's "personal health and well-being have been greatly impacted by her experience of depression[.]" AR 3354. At the time of the assessment, plaintiff was using cannabis and alcohol "with somewhat regularity." AR 3356. ASW Gendreau did "not believe Jalissa's symptoms are accounted for by a substance use or a medical condition." AR 3365. ASW Gendreau observed that, after six months of wraparound services—including counseling, medical consultation, and case management— plaintiff "has experienced mixed results from these interventions and supports." AR 3366.

On October 8, 2015, licensed psychologist Elizabeth Whelchel, Ph.D., completed a

United States District Court
Northern District of California

1  psychiatric evaluation.  Dr. Whelchel interviewed plaintiff in person and reviewed records from

2  Seneca Center.  AR 3443.  Dr. Whelchel assigned diagnostic impressions of Post-Traumatic Stress

3  Disorder; Bipolar Affective Disorder, II; and Personality Disorder NOS with borderline, antisocial

4  and dependent traits.  AR 3446.  She found that plaintiff could perform simple, detailed, and

5  complex instructions and that plaintiff was moderately impaired in most areas of functioning, except

6  that she was only mildly impaired in her ability to accept instructions from supervisors.[2]  AR 3447.

7       On October 15, 2015, therapist Jarl Hackmeister, L.M.F.T., completed a mental disorder

8  questionnaire form.  AR 3450.  LMFT Hackmeister had seen plaintiff two to three times per month

9  for about fifteen months when the form was completed.  AR 3454.  LMFT Hackmeister explained

10  that plaintiff experienced symptoms of PTSD, including flashbacks to traumatic and abusive events

11  and suicidal ideation; had difficulty sleeping; and experienced "low mood, lethargy, lack of

12  motivation, and low self-worth."  AR 3450.  At times her PTSD manifested in "angry and aggressive

13  outbursts[.]"  AR 3451.  Plaintiff "require[d] a high level of support in order to keep appointments"

14  and struggled with medication compliance.  AR 3450.  LMFT Hackmeister diagnosed plaintiff with

15  Major Depressive Disorder, recurrent episode moderate; with Prolonged Posttraumatic Stress

16  Disorder; and with being a victim of child abuse.  AR 3454.  LMFT Hackmeister opined that "[w]ith

17  regular psychotherapy, her symptoms are likely to improve consistently, though this may take

18  several years particularly without psychiatric support."  *Id.*

19       On November 3, 2015, Nadine Genece, Psy.D., reviewed plaintiff's file, including the

20  reports of LMFT Hackmeister and Dr. Whelchel, as part of the reconsideration review of plaintiff's

21  SSI application.  AR 173.  Dr. Genece found plaintiff not significantly limited in most areas of

22  functioning, with some moderate limitations in her ability: to understand, remember, and carry out

23  detailed instructions; to maintain attention and concentration for extended periods; to interact

24  appropriately with the general public; and to complete a normal workday and workweek without

25  interruptions.  AR 174-175.  Dr. Genece there was no evidence of any substance abuse disorder.

26  AR 176.

27  _____

28       [2] The report incorrectly states that plaintiff was 54 years old at the time of the exam; plaintiff
was in her early 20's.  *See* AR 3443.

United States District Court
Northern District of California

On December 2, 2015, psychiatrist Yasin Mansoor, M.D., conducted a psychiatric assessment for Stars Behavioral Health Group after meeting with plaintiff for the first time.  AR 3483.  The report notes that plaintiff used marijuana "to help relax, sleep and for appetite."  *Id.*  Dr. Mansoor indicated that plaintiff "is currently suffering from mild depression and some sleep problems."  AR 3485.  The report further indicates that on November 5, 2015, plaintiff received a primary diagnosis of Major Depressive Disorder, recurrent, and a secondary diagnosis of Posttraumatic Stress Disorder, unspecified.  AR 3487.

In June 2021, after a prolonged period of substance abuse, plaintiff entered residential care at the Women's Hope program.  It is unclear from the record precisely how long she remained at Women's Hope, but the ALJ found that she "attained sobriety" after entry in this program and that "she has been essentially sober ever since (on June 16, 2022, the claimant reported she had been clean from fentanyl only seven months and that she continued to use marijuana) (44F/2)."  *See* AR 49.

Plaintiff was no longer living at Women's Hope by December 2021, when Steven Kohlstrom, Ph.D., completed an examination for a mental impairment questionnaire.[3]  *See* AR 3217.  The questionnaire indicates that Dr. Kohlstrom reviewed plaintiff's disability claim file and conducted a 50-minute telephonic mental examination.  *Id.*  As of December 1, 2021, plaintiff was two months past her graduation from Women's Hope, "at which time [plaintiff] had already suffered increased psychiatric symptoms and impaired functioning."  AR 3218.  Dr. Kohlstrom diagnosed plaintiff with Posttraumatic Stress Disorder, chronic (primary) and Opioid Use Disorder, Severe, Early Remission (secondary to PTSD).  AR 3217-3218.  Dr. Kohlstrom found plaintiff "has been and continues to be 100 percent totally disabled by her chronic PTSD" and "incapable of functioning in a formal work setting, sheltered/supervised work setting, or home environment for any duration."  AR 3222.  He found plaintiff had marked limitations overall in her ability to understand, remember,

---

[3] Although Dr. Kohlstrom conducted his examination in December 2021, the report is dated May 4, 2022, due to plaintiff's failure to follow through and return questionnaires despite reminders.  AR 3217.  Dr. Kohlstrom "found no reason to believe [plaintiff's] psychiatric conditions and related impairments improved in any way between December 2021 and May 2022 given the severity and chronicity of [plaintiff's] psychiatric conditions since age 12 years old."  *Id.*

and apply information.  AR 3220.  He found plaintiff had extreme limitations overall in her ability: to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage herself.  AR 3220-3221.  Dr. Kohlstrom opined that plaintiff's symptoms would not be expected to significantly improve in the absence of substance use.  AR 3221.

On February 4, 2022, one of plaintiff's treating providers, Regina Whitaker, Ph.D., completed a mental impairment questionnaire.  Dr. Whitaker had treated plaintiff approximately every other week since June 21, 2021.  AR 3210.  Dr. Whitaker described plaintiff's difficulty in attending appointments and engaging with treatment; plaintiff was inconsistent in coming to therapy unless given weekly and daily reminders.  *Id.*  Dr. Whitaker diagnosed plaintiff with Posttraumatic Stress Disorder and Opioid Use, Severe.  *Id.*  Dr. Whitaker described that plaintiff struggles with her activities of daily living: "While the client had the necessary items to care for herself, she would frequently smell of urine, leaving her bed soaked sheets or covers soaked with urine instead of changing the dirty linen to clean linen."  AR 3212.  Dr. Whitaker explained that plaintiff "is frequently reliving her trauma on a daily basis due to the consistent triggers around her even when placed in a structured environment which causes her to experience enuresis as an adult and has become a protection for her through the night into the day."  AR 3213.  Dr. Whitaker assessed plaintiff with "none" to "extreme" limitations in various areas of functioning, with the most extreme limitations in plaintiff's ability to concentrate, persist, or maintain pace.  AR 3212-3213.  Dr. Whitaker stated that "[i]f the client engages in substance use symptoms will be affected" but did not explain how.  AR 3214.  Dr. Whitaker also found plaintiff would be absent from work more than four days per month and would be off-task more than thirty percent of the time in an eight-hour workday.  *Id.*

On October 4, 2022, the ALJ conducted an administrative hearing but adjourned the hearing for a consultative examination to be conducted with testing.  AR 132.  The psychological consultative examination took place with Christine Corrigan, Psy.D., on November 11, 2022.  AR 3464.  Dr. Corrigan conducted a mental status exam and found, among other things, that plaintiff had fair eye contact, coherent speech, and was alert with unimpaired attention.  AR 3466.  However, plaintiff's concentration, calculation, memory, and abstraction were impaired.  *Id.*  Plaintiff had poor

hygiene and had a depressed overall attitude.  *Id.*  Dr. Corrigan conducted a battery of tests and determined that plaintiff's full-scale IQ was 67, or extremely low.  AR 3470.  On the Mini Mental Status Examination, plaintiff scored 19 out of 30, indicating moderate cognitive impairment.  AR 3469.  Dr. Corrigan diagnosed plaintiff with Posttraumatic Stress Disorder, Unspecified Depressive Disorder, Specific Learning Disorder (provisional), and Opioid Use Disorder, in sustained remission.  AR 3472.  Dr. Corrigan found plaintiff had marked limitations in nearly all areas of functioning, except that plaintiff had moderate functioning in her ability to understand, remember, and perform simple/repetitive written and oral instructions.  AR 3473.  Dr. Corrigan concluded, "Claimant reports 1 year of sobriety which indicates current impairments are not due to substance use."  AR 3476.[4]

## II.    Procedural Background

Plaintiff's SSI claim was denied initially and upon reconsideration.  AR 148, 162-163.  On October 4, 2022, Administrative Law Judge ("ALJ") David LaBarre held an administrative hearing and then adjourned the hearing for plaintiff to receive a psychiatric consultative examination.  On November 11, 2022, plaintiff attended the consultative examination with Dr. Corrigan.  The ALJ then held a supplemental hearing on February 3, 2023, during which plaintiff and a vocational expert testified.

On April 26, 2023, the ALJ issued an unfavorable decision.  AR 37-51.  The ALJ found that, including plaintiff's substance use, plaintiff would be disabled because she met the criteria of Listing Section 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1, for Depressive, bipolar, and related disorders.  *See* AR 41.  Nevertheless, the ALJ found that, if plaintiff stopped the substance use, plaintiff would no longer have a Listing-level impairment.  AR 44-48.  The ALJ went on to find that, if plaintiff stopped the substance use, she had the following residual functional capacity (RFC):

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the individual must avoid concentrated exposure to pulmonary irritants such as fumes, dust,

---

[4] Dr. Corrigan's report incorrectly states that plaintiff was 38 years old, when plaintiff was actually in her late 20's.  *See* AR 3464.

United States District Court
Northern District of California

odors, gases and poor ventilation; the individual can perform simple, repetitive tasks involving simple work-related decisions and occasional workplace changes that require no interaction with the general public either on the telephone or in-person; the individual can briefly, but occasionally interact with co-workers that does not involve working on teams; the individual cannot perform fast-paced work such as assembly line work and cannot perform work that requires the individual to be responsible for the safety of others; the individual would need a stable environment, meaning few changes in day-to-day work setting or few changes in the tools and/or work processes used to accomplish the work, and a stable work shift that does not change shift-to-shift or day-to-day; the individual would be absent once per month and off task ten percent of an eight-hour workday.

AR 48.  Relying on the opinion of a vocational expert, the ALJ concluded that plaintiff could perform jobs such as hand packager, floor waxer, and industrial cleaner, if she stopped the substance use.  AR 50-51.  The ALJ found that plaintiff's substance use disorder was a contributing factor material to the determination of disability because she would not be disabled if she stopped the substance use.  AR 51.  The ALJ therefore found plaintiff not disabled.  *Id.*

After the Appeals Council denied plaintiff's review request, AR 20, plaintiff filed for judicial review.  Dkt. No. 1.

## LEGAL STANDARDS

### I.     Standard of Review

The Social Security Act authorizes an Article III court to review final decisions of the Commissioner.  42 U.S.C. § 405(g).  This Court may enter a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the case for a rehearing.  *Id.*

Factual findings of the Commissioner are conclusive if supported by substantial evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2001).  The Court may set aside the Commissioner's final decision when that decision is based on legal error or where the findings of fact are not supported by substantial evidence in the record taken as a whole.  *Tackett v. Apfel,* 180 F.3d 1094, 1097-98 (9th Cir. 1999).  Substantial evidence is "more than a mere scintilla but less than a preponderance."  *Id.* at 1098.  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (internal quotation marks omitted).  To determine whether substantial

United States District Court
Northern District of California

United States District Court
Northern District of California

1    evidence exists, the Court must consider the record as a whole, weighing both evidence that supports

2    and evidence that detracts from the Commissioner's conclusion.  *Tackett*, 180 F.3d at 1098.  "Where

3    evidence is susceptible to more than one rational interpretation," the ALJ's decision should be

4    upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

5    　　　The decision whether to remand for further proceedings or order an immediate award of

6    benefits is within the district court's discretion.  *Harman v. Apfel*, 211 F.3d 1172, 1175-78 (9th Cir.

7    2000).  When no useful purpose would be served by further administrative proceedings, or where

8    the record has been fully developed, it is appropriate to exercise this discretion to direct an

9    immediate award of benefits.  *Id*. at 1179 ("the decision of whether to remand for further proceedings

10   turns upon the likely utility of such proceedings").  But when there are outstanding issues that must

11   be resolved before a determination of disability can be made, and it is not clear from the record the

12   ALJ would be required to find the claimant disabled if all the evidence were properly evaluated,

13   remand is appropriate.  *Id*.

14

15   **II.      The Five-Step Disability Inquiry**

16   　　　A claimant is "disabled" under the Social Security Act if: (1) the claimant "is unable to

17   engage in any substantial gainful activity by reason of any medically determinable physical or

18   mental impairment which can be expected to result in death or which has lasted or can be expected

19   to last for a continuous period of not less than twelve months," and (2) the impairment is "of such

20   severity that he is not only unable to do his previous work but cannot, considering his age, education,

21   and work experience, engage in any other kind of substantial gainful work which exists in the

22   national economy."  42 U.S.C. § 1382c(a)(3)(A)-(B).

23   　　　The SSA regulations provide a five-step sequential evaluation process for determining

24   whether a claimant is disabled.  20 C.F.R. § 416.920(a)(4).  The claimant has the burden of proof

25   for steps one through four and the Commissioner has the burden of proof for step five.  *Tackett*, 180

26   F.3d at 1098.  The five steps of the inquiry are:

27

28   　　　　　　　1. Is claimant presently working in a substantially gainful activity?  If
     　　　　　　　so, then the claimant is not disabled within the meaning of the Social

1    Security Act.   If not, proceed to step two.   *See* 20 C.F.R.
     §§ 404.1520(b), 416.920(b).

2    2. Is the claimant's impairment severe?  If so, proceed to step three.
3    If not, then the claimant is not disabled.   *See* 20 C.F.R.
     §§ 404.1520(c), 416.920(c).

4    3. Does the impairment "meet or equal" one of a list of specific
     impairments described in 20 C.F.R. Part 220, Appendix 1?[5]  If so,
5    then the claimant is disabled.  If not, proceed to step four.  *See* 20
     C.F.R. §§ 404.1520(d), 416.920(d).

6
7    4. Is the claimant able to do any work that he or she has done in the
     past?  If so, then the claimant is not disabled.  If not, proceed to step
     five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

8
9    5. Is the claimant able to do any other work?  If so, then the claimant
     is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R.
     §§ 404.1520(f), 416.920(f).

10

11   *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).  The ALJ has an affirmative duty to

12   assist the claimant in developing the record at every step of the inquiry.  *Tackett*, 180 F.3d at 1098

13   n.3.

14          In between the third and fourth step, the ALJ must determine the claimant's Residual

15   Functional Capacity ("RFC").  20 C.F.R. §§ 404.1520(a)(4), (e), 416.945(a)(5)(1).  To determine

16   the RFC, the ALJ considers the impact of the claimant's symptoms on his or her ability to meet the

17   physical, mental, sensory, and other requirements of work.  *Id.* §§ 404.1545(a)(4), 416.945(e).  The

18   ALJ will evaluate all the claimant's symptoms and the extent to which these symptoms are

19   consistent with evidence in the record.  *Id.*  The evidence can include the claimant's own statements

20   about his or her symptoms, but such statements must be adequately supported by the record in order

21   to establish a disability.  *Id.*  In order to determine whether the claimant's statements are adequately

22   supported, the ALJ must first determine whether the claimant has a medical impairment that could

23   reasonably be expected to produce his or her symptoms, and then must evaluate the intensity and

24   persistence of the claimant's symptoms.  *Id.*  When evaluating intensity and persistence, the ALJ

25   must consider all of the available evidence, including the claimant's medical history, objective

26   medical evidence, and statements about how the claimant's symptoms affect him or her.  *Id.*  The

27

28          _____
            [5] The listing of impairments is now located at 20 C.F.R. Part 404, Subpart P, Appendix 1.

1    ALJ cannot reject statements about the intensity and persistence of symptoms solely because no

2    objective medical evidence substantiates the statements.  *Id.* §§ 404.1529(c)(2), 416.929(c)(2).  The

3    ALJ must also consider factors relevant to the claimant's symptoms, such as the claimant's daily

4    activities, the claimant's medications and treatment, any other measures the claimant uses to

5    alleviate symptoms, precipitating and aggravating factors, and any other factors relevant to the

6    claimant's limited capacity for work due to his or her symptoms.  *Id.* § 416.929(c)(3)(i)-(vii).  After

7    determining the RFC, the ALJ proceeds to steps four and five of the disability inquiry.

8

9    **III.    Drug Addiction and Alcoholism**

10           If, considering all of the claimant's medically determinable impairments, there is a

11   determination that the claimant is disabled, and there is medical evidence showing drug addiction

12   and alcoholism ("DAA"), then the ALJ must determine whether the DAA is "material" to the finding

13   that the claimant is disabled.  20 C.F.R. §§ 404.1535, 416.935.  The Social Security Act provides

14   that a claimant "shall not be considered to be disabled . . . if alcoholism or drug addiction would . . .

15   be a contributing factor material to the . . . determination that the individual is disabled."  42 U.S.C.

16   § 423(d)(2)(C).   In determining whether a claimant's DAA is material, the test is whether an

17   individual would still be found disabled if he or she stopped using drugs or alcohol.  *See* 20 C.F.R.

18   §§ 404.1535(b), 416.935(b); *Parra v. Astrue*, 481 F.3d 742, 746-47 (9th Cir. 2007); *Sousa v.*

19   *Callahan*, 143 F.3d 1240, 1245 (9th Cir. 1998).  The ALJ must "evaluate which of [the claimant's]

20   current physical and mental limitations . . . would remain if [the claimant] stopped using drugs or

21   alcohol and then determine whether any or all of [the claimant's] remaining limitations would be

22   disabling."  20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2).  If the ALJ determines that the claimant's

23   remaining limitations are disabling, then the claimant's DAA is not a material contributing factor to

24   the determination of disability, and the claimant is disabled, independent of his or her DAA.  *See id.*

25   §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).   The claimant bears the burden of proving that his

26   substance use is not a material contributing factor to his disability.  *Parra*, 481 F.3d at 745.

27           The Ninth Circuit has ruled that when a claimant has a history of drug or alcohol use, the

28   ALJ must first determine the severity of the claimant's symptoms without attempting to filter out

United States District Court
Northern District of California

which impairments are related to the claimant's drug or alcohol use. *Bustamante*, 262 F.3d at 955. If the ALJ determines that the claimant's impairments, including the impairments related to drug or alcohol use, are severe enough to be disabling, then the ALJ proceeds in assessing the materiality of the claimant's DAA, i.e. whether the claimant would still be found disabled if he or she stopped using drugs or alcohol. *Id.* (interpreting 20 C.F.R. §§ 404.1535, 416.935); *see also* SSR 13-2p, 78 Fed. Reg. 11939, 11941 (Feb. 20, 2013).[6]

## DISCUSSION

Plaintiff's motion presents the following issues for resolution:

> 1. Did the ALJ err in rejecting Plaintiff's medical source opinions without providing legally sufficient reasons supported by substantial evidence?
>
> 2. Did the ALJ err in rejecting Plaintiff's testimony without providing specific or clear and convincing reasons supported by substantial evidence?
>
> 3. Did the ALJ err in determining Plaintiff's residual functional capacity?
>
> 4. Did the ALJ err in determining that Plaintiff's drug and alcohol use was material?
>
> 5. Did the ALJ err by relying on Vocational Expert ("VE") testimony based on an incomplete hypothetical to find Plaintiff not disabled?

Pl.'s Br. at 1.

## I.    Medical Source Opinions

The Court first addresses plaintiff's argument that the ALJ erred in rejecting certain medical source opinions without providing legally sufficient reasons supported by substantial evidence.

---

[6] Social Security Rulings in the Federal Register are published by the Commissioner of Social Security and are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1).

United States District Court
Northern District of California

## A.    Legal Standard

For applications filed on or after March 27, 2017, such as here, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies." *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022). Under the revised regulations, 20 C.F.R. § 404.1520c and § 416.920c, the ALJ will consider medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5) . . . ." 20 C.F.R. § 416.920c(a). Those factors are: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 416.920c(c). In determining how persuasive a medical opinion is, the most important factors are supportability and consistency. *Id.* § 416.920c(a), (b)(2). "Therefore, [the agency] will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions . . . ." *Id.* § 416.920c(b)(2). The agency "may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) . . . ." *Id.* "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods*, 32 F.4th at 792. "The agency must articulate . . . how persuasive it finds all of the medical opinions from each doctor or other source." *Id.* at 791 (citing 20 C.F.R. § 404.1520c(b) (internal quotation marks omitted)).

## B.    Medical Opinions and ALJ's Findings

When conducting the five-step disability inquiry, the ALJ found that, including plaintiff's substance use, plaintiff was disabled at step three because she met one of the "Listings" of impairments. In so finding, the ALJ found:

> the opinions of listing-level impairment expressed by Regina Whitaker, Ph.D., Steven Kohlstrom, Ph.D., Christine Corrigan, Psy.D., and Jarl Hackmeister, LMFT persuasive insofar as they pertain to periods of active substance abuse because they are consistent and the claimant's treatment records from her application date until June 17, 2021 support findings of marked to extreme limitation in at least two of the functional domains when the claimant is actively abusing drugs and alcohol (31F, 32F, 40F, and 42F).

AR 44.

The ALJ then went back through the five-step inquiry, asking whether plaintiff would be disabled without the substance use. At step three, the ALJ found that, if plaintiff stopped the substance use, she would not have an impairment meeting the criteria of Listing 12.04. AR 44-48. The ALJ found "persuasive" the medical opinions of Dr. Whelchel and Dr. Genece. AR 46. Although the ALJ did not state how he weighed the opinions of ASW Gendreau, Dr. Mansoor, and Dr. Annunziata,[7] the ALJ also relied heavily on these three sources' assessments. *See id.* at 46-47. At this step, the ALJ did not address the opinions of Drs. Whitaker, Kohlstrom, or Corrigan nor of LMFT Hackmeister.

In determining plaintiff's RFC, the ALJ found the opinions of Drs. Whelchel and Genece "persuasive during periods of sobriety[.]" AR 49. By contrast, the ALJ found "the opinions of listing-level impairment expressed by Regina Whitaker, Ph.D., Steven Kohlstrom, Ph.D., Christine Corrigan, Psy.D., and Jarl Hackmeister, LMFT unpersuasive during periods of sobriety because they are unsupported by the medical evidence of record, which is inconsistent with severe impairment after June 17, 2021." AR 50. The ALJ explained why he found Dr. Corrigan's findings regarding plaintiff's intelligence inconsistent with other evidence in the record and then concluded: "Thus, Dr. Corrigan's opinions and observations, as well as the consistent opinions of Mr. Hackmeister and Drs. Whitaker, Kohlstrom are unsupported by the record as a whole." *Id.*

Plaintiff argues that the ALJ did not properly consider the consistency and supportability factors and failed to provide legally sufficient reasons supported by substantial evidence for rejecting the medical opinions of Drs. Corrigan, Whitaker, and Kohlstrom. Pl.'s Br. at 13-19.

C.    **Analysis**

The Court agrees with plaintiff that the ALJ erred in evaluating the medical opinions and that the error was not harmless. Under the regulations, the ALJ is required to "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions . . . ."

---

[7] Jennifer Annunziata, M.D., treated plaintiff during her time at Women's Hope.

United States District Court
Northern District of California

20 C.F.R. § 416920c(b)(2).  "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'"  *Woods*, 32 F.4th at 791-92 (quoting 20 C.F.R. § 404.1520c(c)(1)).  "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'"  *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

First, the ALJ did not address the "supportability" of the opinions of Drs. Corrigan, Whitaker, and Kohlstrom except with the following conclusory logic: "they are unsupported by the medical evidence of record, which is inconsistent with severe impairment after June 17, 2021."  AR 50.  In this way, the ALJ did not address how these three doctors used "the objective medical evidence and supporting explanations . . . to support his or her medical opinions . . . ."  *See* 20 C.F.R. § 416.920c(c)(1).  Under the regulations, it was error for the ALJ not to address the supportability factor.  Moreover, the two opinions the ALJ found most persuasive, those of Drs. Genece and Whelchel, were far more cursory and gave less explanation for their conclusions than Drs. Corrigan and Kohlstrom.

The ALJ also erred with regard to the "consistency" factor.  The ALJ did not separately address the opinions of Drs. Whitaker and Kohlstrom at all and discounted Dr. Corrigan's opinion based solely on a finding that her conclusion regarding plaintiff's intelligence was inconsistent with other evidence.  *See* AR 50.  After explaining why Dr. Corrigan's intelligence findings were incorrect, the ALJ concluded: "Thus, Dr. Corrigan's opinions and observations, as well as the consistent opinions of Mr. Hackmeister and Drs. Whitaker, Kohlstrom are unsupported by the record as a whole."[8]  *Id.*  In other words, the ALJ dismissed the opinions of Drs. Corrigan, Whitaker, and Kohlstrom in one stroke and with hardly an explanation, despite acknowledging that their opinions were "consistent" with each other.  In another case involving similar treatment of medical opinions by the ALJ, this Court explained, "the ALJ's collective analysis of five medical opinions resulted

---

[8] Although the ALJ stated that he found the opinions of Drs. Corrigan, Kohlstrom, and Whitaker "*unsupported* by the medical evidence of record," AR 50 (emphasis added), his rejection of Dr. Corrigan's intelligence findings goes more to the "consistency" factor, which looks to whether the opinion is consistent with other evidence in the record.  *See* 20 C.F.R. § 416.920c(c)(1), (2).

United States District Court
Northern District of California

1    in a failure to adequately address the consistency factor.  Here, it was simply incorrect for the ALJ

2    to find the five opinions were inconsistent with other medical or nonmedical sources, where the

3    rejected opinions were often consistent with each other."  *See Laura G. v. Colvin*, No. 23-cv-6617-

4    SI, Dkt. No. 25 at 8 (N.D. Cal. Apr. 3, 2025).  So too here.

5         In this case, the ALJ found the opinions of three doctors and a therapist inconsistent with the

6    record as a whole even where they were consistent with each other.[9]  For instance, Dr. Kohlstrom

7    found plaintiff had marked limitations in her overall ability to understand, remember, and apply

8    information.  AR 3220.  Dr. Corrigan found plaintiff had moderate limitation in her ability to

9    understand, remember, and perform simple/repetitive instructions but that, if the instructions were

10   complex/detailed, then her limitations were "extreme."  AR 3473.  Dr. Kohlstrom also opined that

11   plaintiff had extreme limitations in her overall ability to interact with others; to concentrate, persist,

12   or maintain pace; and to adapt or manage herself.  AR 3220-3221.  Dr. Corrigan similarly found

13   plaintiff had marked limitations in her ability to interact with others; to maintain concentration,

14   attention, and persistence/consistency in a normal workday; in her ability to adapt to usual stresses

15   in the work environment; in her ability to perform activities within a schedule and maintain regular

16   attendance; and in her ability to complete a normal workday or workweek without interruptions

17   from a psychiatric condition.  AR 3473.  While Dr. Whitaker's report generally assessed less

18   extreme limitations than did Dr. Kohlstrom and Dr. Corrigan—with limitations ranging from "none"

19   to "extreme"—Dr. Whitaker found that plaintiff had primarily "marked" to "extreme" limitations in

20   her ability to concentrate, persist, or maintain pace.  *See* AR 3213.  Dr. Whitaker also opined that

21   plaintiff would be absent from work four days or more per month and would be off-task more than

22   thirty percent of the time in an eight-hour workday.  AR 3214.

23        The ALJ apparently rejected Dr. Corrigan's opinion (and with it the opinions of Drs.

24   Kohlstrom and Whitaker) solely based a dispute with Dr. Corrigan's findings regarding plaintiff's

25   intelligence.  *See* AR 50.  The ALJ explained:

26             With specific regard to Dr. Corrigan's psychological consultative

27   _____

28        [9] The Court does not specifically address the treatment the ALJ gave to LMFT Hackmeister's
     opinion, as plaintiff does not use this as a basis to challenge the ALJ's decision.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8

examination, the undersigned notes that Dr. Corrigan's Wechsler Adult Intelligence Scales-4th Edition (WAIS-IV) results are inconsistent with all other estimates of the claimant's intelligence contained in the record (31F, 32F, 40F, and 42F).[10] 2009 Wechsler Abbreviated Scale of Intelligence (WASI) results show a low average full-scale IQ of 90 (36F/10). As discussed under Finding 5, Drs. Gendreau and Whelchel also estimated the claimant's intelligence was in the low average range (37F and 39F). Finally, the undersigned notes that while the claimant reported to Dr. Corrigan that she had received special education services, high school transcripts show no special education. While the claimant's school performance was sporadic, Dr. Corrigan's full-scale IQ score of 67 is unsupported by those records, which show the claimant was capable of earning As and Bs in regular education classes (7E, 8E, 31E, and 32E). Thus, Dr. Corrigan's opinions and observations, as well as the consistent opinions of Mr. Hackmeister and Drs. Whitaker, Kohlstrom are unsupported by the record as a whole.

9

*Id.* After conducting a battery of tests, Dr. Corrigan found plaintiff had an IQ of 67, i.e., on the

10

"extremely low" end. AR 3470. Other providers and examiners found plaintiff's intelligence was

11

on the low end of average. AR 3365 (ASW Gendreau stating plaintiff was of "average intellect"),

12

3345 (Dr. Whelchel stating, "The claimant appears to be of at least average intelligence"), 3219 (Dr.

13

Kohlstrom finding that plaintiff's "IQ appeared to be low-average" based on a holistic review of the

14

claim file and limited academic records). However, none of these other opinions were formed after

15

formal testing. That Dr. Corrigan, after conducting testing, assessed plaintiff's IQ to be lower than

16

what some of the other providers and examiners had estimated does not constitute substantial

17

evidence showing that Dr. Corrigan's opinion was wrong altogether. This is particularly so where

18

Dr. Corrigan's report relied on more than just the intelligence findings, and other evidence in the

19

record supports her intelligence findings. *See, e.g.*, 1508-1509 (special education records showing

20

that, in her early 20's, plaintiff had math skills at a 3rd grade level and was reading at a 5th grade

21

level), 3330 (assessment noting that 3rd grade standardized testing showed plaintiff in 9th percentile

22

for reading and 1st percentile in language, spelling, and math).

23

Nor was the ALJ's treatment of ASW Gendreau's assessment supported by substantial

24

evidence. Although the ALJ did not specify how much weight he gave to the opinion of ASW

25

Gendreau, he relied heavily on Gendreau's 2015 assessment in supporting his conclusion that drug

26

and alcohol abuse was material to plaintiff's disability. *See* AR 46. First, as plaintiff notes, the ALJ

27
28

United States District Court
Northern District of California

[10] Exhibit 42F is Dr. Corrigan's own report. *See* AR 3464-3478.

erroneously referred to ASW Gendreau as "Dr. Gendreau" throughout, indicating that the ALJ may have erroneously favored Gendreau's opinion based on her field of specialty. *See id.*; 20 C.F.R. § 416.920c(c)(4) (opinion of a medical source "who has received advanced education and training to become a specialist may be more persuasive . . ."). The ALJ also made a number of logical leaps from Gendreau's assessment, inferring things regarding plaintiff's limitations that Gendreau's report did not address. For instance, the ALJ inferred that plaintiff "has no more than moderate limitation interacting with others" because Gendreau's report referred to plaintiff feeling "deeply connected with her 4-year-old son." *See* AR 46. The son the report referred to was removed from plaintiff and placed into foster care as an infant due to medical neglect, and (according to Gendreau's report) plaintiff's reunification/visitation plans were terminated after she failed to show up for multiple visits. *See* AR 3361; *see also* AR 3444 (Dr. Whelchel's report, issued later the same year as Gendreau's, indicating plaintiff had no contact with her son), AR 3380 (June 2014 report indicating no contact with son). That Gendreau identified plaintiff's son "as her motivation and inspiration for making positive changes in her life" does not support the logical leap the ALJ took in inferring plaintiff therefore had no more than moderate limitations interacting with other people. *See* AR 46, 3358.

Likewise, the ALJ took an excerpt out of context in which Gendreau, in identifying plaintiff's "strengths and supports," stated that plaintiff "has shown remarkable insight into her strengths and areas for change." *See* AR 46, 3358. From that, the ALJ inferred that plaintiff had "only mild limitations understanding, remembering, and applying information and adapting or managing oneself." *See* AR 46. Nothing about Gendreau's statement bears on plaintiff's ability to remember or to adapt or manage herself in the workplace. The same goes for the leap the ALJ made that being "talented and [having] interests in art, photography, and yoga, and [having] developed several coping strategies. . . for managing difficult emotions" translated into "no more than moderate limitations [in] concentration, persistence or pace." *See id.* Gendreau's assessment spans more than ten pages of text and assessments. Yet the ALJ focused on one paragraph of the report, which asked for plaintiff's "strengths and supports," to infer only mild to moderate limitations in a number of functional areas, when Gendreau herself made no such findings. *See* AR 46, 3358. The ALJ did

not discuss Gendreau's findings regarding the impact of plaintiff's depression on her functioning, AR 3354, that her consistent inability to keep appointments made it difficult for her to engage in treatment and jeopardized her housing, AR 3352, 3354, 3366, and that after six months of wraparound services, plaintiff had only "experienced mixed results from these interventions and supports[,]" AR 3366.

Finally, the Court notes that the chronology of plaintiff's period of substance use does not support the ALJ's decision to credit the opinions of Drs. Corrigan, Kohlstrom, and Whitaker only during periods of substance use but to discard their opinions as to periods of sobriety. None of their examinations or treatment occurred during plaintiff's period of substance use, which the ALJ found spanned from 2016 until her entry into Women's Hope in June 2021. *See* AR 49. Moreover, the opinions of Drs. Corrigan, Kohlstrom, and Whitaker are the only recent medical opinions in the record, yet the ALJ rejected them as unpersuasive during periods of sobriety, in favor of opinions issued in 2015 (also a period of sobriety, according to the ALJ's timeline) without explaining why.

In sum, for the reasons stated above, the Court concludes that the ALJ erred in his consideration and articulation of the medical opinions in the record. Because these opinions formed the basis of the ALJ's conclusion that drug and alcohol addiction were material to plaintiff's disability and that plaintiff did not meet Listing 12.04 with the substance use included, the error was not harmless.

## II.    Plaintiff's Symptom Testimony

Plaintiff also argues that the ALJ erred in rejecting her symptom testimony.

### A.    Legal Standard

The Ninth Circuit has established a two-step analysis for determining how to credit a claimant's symptom testimony:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. . . .

United States District Court
Northern District of California

> If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases.

*Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014-15(9th Cir. 2014)). If the ALJ finds the claimant's allegations of severity are not credible, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

### B.    Hearing Testimony and ALJ's Findings

At the hearing on February 2, 2023, plaintiff testified to her physical symptoms and her symptoms of depression. She stated that she dislocated her left knee at age 18 and had to have surgery, and that her knee sometimes swells up for three to four days, such that at times she cannot stand or walk for more than an hour and cannot walk more than a block and a half before it begins to hurt. AR 80-81. She also testified to near daily back pain, which sometimes caused her to be unable to move for a day or two. AR 81-82. Plaintiff testified that she has daily panic attacks, which take about three hours for her to recover from. AR 84-85. She states that she leaves the apartment once or twice a month. AR 86. At the time of the hearing, she was on Zoloft, which she took three to four days a week. AR 91. Plaintiff described her most recent work as a package delivery job, from which she was fired after less than one month because she could not keep up with the work, would fail to answer the phone when her supervisors called, missed days of work, and got overwhelmed. AR 77-80.

The ALJ summarized plaintiff's hearing testimony as follows:

> The claimant testified she last used drugs and alcohol "eight years ago." As discussed under Findings 5 and 6, the medical evidence of record shows continuous daily drug use from 2016 until June 2021. The claimant testified she is unable to maintain a job because she becomes frustrated and self-isolates when she has "too many tasks and too many things to do." She also described difficulties communicating and "remaining available." As discussed under Finding 5, the medical evidence of record shows the claimant had normal mental status examinations after she attained sobriety. The claimant also described limitations due to alleged physical

United States District Court
Northern District of California

impairments including knee and back impairments. As discussed
under Finding 2, the claimant has no severe physical impairments.
Thus, the claimant's allegations are unsupported by the medical
evidence of record.

AR 48.

At the first step of the credibility test, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. AR 49. The ALJ cited no evidence of malingering. At the second step, the ALJ found that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record and that the "medical evidence of record is inconsistent with disability during periods of sobriety." *Id.* The ALJ referred back to his findings at step three in finding that plaintiff "had no limitations performing simple and complex tasks from 2015 to 2016 and that she demonstrated no more than moderate limitations interacting with others, concentration, persistence or pace, and adapting or managing oneself." *Id.* Following years of substance abuse from 2016 to June 2021, the ALJ found "she has been essentially sober ever since[.]" *Id.* The ALJ then went on to explain,

> Those records are inconsistent with severe mental impairment
> because they show the claimant has had no mental health treatment
> since September 2021, but that mental status examinations during
> medical visits have been normal. Thus, the medical evidence of
> record is inconsistent with disability during periods of sobriety
> because records from the claimant's previous application show she
> had no more than moderate limitations before she began daily drug
> and alcohol abuse in 2016 and records related to her present
> application are inconsistent with severe impairment after she attained
> sobriety in June 2021.

*Id.*

## C.    Analysis

The Court finds that the ALJ erred in rejecting plaintiff's symptom testimony—particularly her testimony regarding her depression and its impact on her ability to function and to hold down a job—without offering specific, clear and convincing reasons supported by substantial evidence. The ALJ's rejection of plaintiff's testimony rested almost entirely on the following two observations, repeated throughout the ALJ's decision: that plaintiff had "consistently normal" mental status

examinations after achieving sobriety in June 2021 and that plaintiff had not sought mental health treatment since September 2021.  *See* AR 45, 47, 49.

The references to the "normal" mental status examinations are to two findings in August and September 2021 by Dr. Jennifer Anunziata, M.D., who treated plaintiff during the months after she entered the Women's Hope residential treatment program.  In her notes, Dr. Annunziata wrote, among other things, "MSE: nl speech, motor, grooming. M/a full range and congruent TP linear Tc as above."  AR 2416 (Aug. 19, 2021 treatment note), 2305 (Sept. 23, 2021 treatment note).  The ALJ referred to these single lines in Dr. Annunziata's notes at least four times throughout the decision, in support of his conclusion that plaintiff had "consistently normal" mental status exams during periods of sobriety.  *See* AR 45, 47.  The 3500-page record contains other mental status examinations, more recent and from periods when plaintiff was not living in highly structured residential treatment.  For instance, Dr. Corrigan conducted a mental status exam, far more comprehensive than the one-sentence notes from Dr. Annunziata.  *See* AR 3466-3467.  Among other things, that mental status exam noted plaintiff's poor hygiene, depressed attitude overall, and impaired concentration, calculation, memory, abstraction, and judgment.  *Id.*  For the ALJ to repeatedly rely on two normal mental status examinations, performed a month apart and during the brief period that plaintiff was in residential treatment, is the essence of cherry-picking from the record.  An ALJ may not selectively rely on some entries in the record while ignoring others.  *See Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001).

The ALJ also rejected plaintiff's symptom testimony on the grounds that she has not been in mental health treatment since September 2021.  This too was error.  "[W]hen the evidence suggests lack of mental health treatment is partly due to a claimant's mental health condition, it may be inappropriate to consider a claimant's lack of mental health treatment when evaluating the claimant's failure to participate in treatment."  *Jeanette R. v. Kijakazi*, 620 F. Supp. 3d 1127, 1138 (E.D. Wash. 2022) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).  Here, plaintiff's inability to keep appointments and follow through on treatment was well documented by nearly every provider and examiner throughout the years, both pre-dating and post-dating her period of substance use.  For instance, in March 2015 ASW Gendreau explained that plaintiff's depressive

symptoms had resulted in her not attending school regularly since November, that her housing was in jeopardy due to missing numerous meetings with staff from her housing program, and that she failed to show up for two monthly appointments with her psychiatrist. AR 3352. In October 2015, LMFT Hackmeister explained that plaintiff

> requires a high level of support in order to keep appointments. Providers provide reminders via phone and text, and meet [plaintiff] at her home, but all appointments still are not kept. [Plaintiff] may miss appointments due to being asleep, not having active phone service, or choosing to cancel due to depressive and/or anxious symptoms, such as lethargy, low motivation, feelings of overwhelm, or preoccupation with other concerns.

AR 3450. In February 2022, Dr. Whitaker, the treating therapist at the time, explained:

> The client was not consistent in coming to therapy. The client would either come late to scheduled appointments or she would did [sic] not come but would consistently rescheduled [sic]. When she was provided with reminders and weekly and daily reminders, she was consistent to her appointments. With consistent firm structure the client would flourish and be able to function 3 out of 7 days a week before she would fall back into her inconsistent bx.

AR 3210. At her second administrative hearing, plaintiff testified that she was having a hard time finding a therapist. AR 85. Given the extensive documentation in the record during periods of sobriety showing that plaintiff has consistently struggled to engage in mental health treatment, it was error for the ALJ to reject plaintiff's testimony on the grounds that she has not received mental health treatment since September 2021.

Finally, to the extent the ALJ rejected plaintiff's testimony as inconsistent with evidence regarding when she abused substances, this misstated the testimony. The ALJ stated that plaintiff testified at the February 2023 hearing that "she last used drugs and alcohol 'eight years ago.'" AR 48. The ALJ found this inconsistent because "the medical evidence of record shows continuous daily drug use from 2016 until June 2021." Id. At the hearing, when questioned by her attorney when was the last time she used drugs or alcohol, plaintiff responded, "Probably eight years ago." AR 89. However, when later questioned by the ALJ, the following exchange occurred:

> Q.    Okay. And so in terms of the drug use, counsel asked you when was the last time you used any kind of street drugs, and I believe you said, eight years ago. Did I hear that right?
>
> A.    She asked when was the last time I had a drink, and I said eight

United States District Court
Northern District of California

years ago.

> Q.    Okay, so that was--
>
> A.    But--
>
> Q.    That was only--
>
> A.    --street drugs--
>
> Q.    Go ahead, I'm sorry.  Go ahead and say what you want to say.
>
> A.    When was the last time I did street drugs?  Two years.
>
> Q.    Yes.  I'm sorry.  Did I hear three years ago?
>
> A.    Two.  Two years.
>
> Q.    Okay, so two years ago, would that have been in 2020 or 2021?
>
> A.    '21.
>
> Q.    That's 2021?
>
> A.    Yes, I'm sorry.

AR 91-92.  Plaintiff then explained that she last used fentanyl at the end of 2020 and last used methamphetamines and heroin in 2020 as well.  AR 93.  She testified to still smoking marijuana every other day to manage her cravings.  AR 94.  Thus, the ALJ's statement that plaintiff testified that she stopped using drugs eight years ago did not account for the later exchange in which plaintiff clarified that she stopped using "street drugs" in late 2020 and 2021.  This later testimony was consistent with the ALJ's understanding that plaintiff stopped the substance use, with the exception of marijuana, after entering residential treatment in June 2021.

The Court need not reach plaintiff's remaining arguments regarding the subsequent ways in which the ALJ erred.  The ALJ's error in evaluating the medical opinions and plaintiff's symptom testimony necessarily impacted the remainder of the ALJ's decision and warrant reversal.

## III.    Remedy

Having found that the ALJ committed reversible error, the Court proceeds to the question of remedy.  Plaintiff has requested that the Court remand this matter for immediate award of benefits, and the Court finds this is one of the rare cases in which such a remedy is warranted.

United States District Court
Northern District of California

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). However, under the credit-as-true rule, the Court may order an immediate award of benefits if three conditions are met. First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Id.* (quoting *Garrison*, 759 F.3d at 1020). Second, the Court must "determine whether there are outstanding issues that must be resolved before a disability determination can be made, . . . and whether further administrative proceedings would be useful." *Id.* (citations and internal quotation marks omitted). Third, the Court then "credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id.* (citing *Treichler*, 775 F.3d at 1101). Even when all three criteria are met, whether to make a direct award of benefits or remand for further proceedings is within the district court's discretion. *Id.* (citing *Treichler*, 775 F.3d at 1101).

Here, the Court has found that the ALJ failed to appropriately consider and articulate the medical opinions, particularly those of Drs. Corrigan, Kohlstrom, and Whitaker. The ALJ also provided legally insufficient reasons for rejecting plaintiff's symptom testimony. The Court further finds there are no outstanding issues to resolve. The record in this case totals more than 3500 pages and contains treatment records and assessments from numerous sources spanning more than a decade. The ALJ conducted two administrative hearings, adjourning the first one so that a consultative examiner could perform testing, and then rejecting that examiner's findings (Dr. Corrigan's) with little explanation. Defendant has not identified any specific record or testimony needed to complete the record. The Court finds the record does not need further development and that further administrative proceedings would not be useful.

Crediting the discredited testimony as true, there is no doubt as to plaintiff's disability. Numerous providers and examiners over the years have diagnosed plaintiff with PTSD and major depressive disorder. Although plaintiff abused substances for a number of years, these diagnoses both pre-and post-date that period. And while plaintiff testified that she continues to use marijuana

to curb her cravings for other drugs, no source in the record has ever suggested that plaintiff's symptoms would alleviate in the absence of marijuana use, nor did the ALJ so find.  At step three of the five-step inquiry, the ALJ found that, including the substance use, plaintiff met the criteria for Listing 12.04.  AR 41.  The ALJ further found, however, that plaintiff would not meet the criteria for a Listing if she stopped the substance use because she did not meet the paragraph "B" criteria of that listing.[11]  *See* AR 44-48; 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.04.  The paragraph B criteria requires:

> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
>
> 1. Understand, remember, or apply information (see 12.00E1).
> 2. Interact with others (see 12.00E2).
> 3. Concentrate, persist, or maintain pace (see 12.00E3).
> 4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.04.  Dr. Kohlstrom found plaintiff had marked limitation in her ability to understand, remember, or apply information.  AR 3220.  He found she had extreme limitation in her ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage herself.  AR 3220-3221.  Dr. Kohlstrom also found that plaintiff's impairments would not be expected to significantly improve in the absence of substance use.  AR 3221.  Dr. Corrigan found plaintiff had marked limitations in her ability to interact with others, in her ability to maintain concentration and persistence/consistency during a normal workday, and in her ability to adapt to the usual stresses common to a competitive work environment.  AR 3473.  Dr. Corrigan also explained that plaintiff's year of sobriety at the time of examination (in November 2022) "indicate[d] that current impairments are not due to substance use."[12]  AR 3476.  Crediting as true the opinions of either Dr. Corrigan or Dr. Kohlstrom, plaintiff would meet the paragraph B criteria

---

[11] Elsewhere, the ALJ found that plaintiff met the paragraph "A" criteria for Listing 12.04, which requires medical documentation of, *inter alia*, depressive disorder.  *See* AR 42; 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.04.

[12] Dr. Whitaker found plaintiff would be absent from work four days or more per month and would be off-task more than thirty percent of the time.  AR 3214.  When asked whether plaintiff's symptoms would be expected to improve in the absence of substance use, Dr. Whitaker checked the box for "Unknown."  *Id.*  Dr. Whitaker's report issued in February 2022, roughly seven months into plaintiff's period of sobriety.

United States District Court
Northern District of California

1  for Listing 12.04 (Depressive, bipolar and related disorders) and plaintiff would be found disabled

2  at step three.

3       The Court sees no basis for serious doubt in the record that plaintiff is disabled.  Moreover,

4  remand for benefits is appropriate here where plaintiff's current disability application has been

5  pending for more than seven years, and the ALJ held multiple hearings at the administrative level.

6  *See Vertigan v. Halter*, 260 F.3d 1044, 1053 (9th Cir. 2001); *Benecke v. Barnhart*, 379 F.3d 587,

7  595 (9th Cir. 2004) ("Allowing the Commissioner to decide the issue again would create an unfair

8  'heads we win; tails, let's play again' system of disability benefits adjudication.") (citation omitted).

9  The Court will remand for immediate payment of benefits.

10

11  ## CONCLUSION

12       For the foregoing reasons, the Court REVERSES the decision of the Commissioner and

13  REMANDS this case pursuant to sentence four of 42 U.S.C. § 405(g) for an immediate payment of

14  benefits.

15

16       **IT IS SO ORDERED**.

17  Dated: September 19, 2025

18  _____

19  SUSAN ILLSTON
   United States District Judge

United States District Court
Northern District of California